No. 24-2034

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

THE ESTATE OF PAUL BROWNING, ex rel. BETTY BROWNING, ADMINISTRATOR OF THE ESTATE OF PAUL BROWNING,

*Plaintiff-Appellant,*

*v.*

LAS VEGAS METROPOLITAN POLICE DEPARTMENT, ET AL.

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the District of Nevada, Las Vegas
No. 2:20-CV-01381-KJD-MDC

_____

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

_____

David B. Owens
CIVIL RIGHTS AND JUSTICE CLINIC
UNIVERSITY OF WASHINGTON LAW SCHOOL
William H. Gates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
O: 312-243-5900
david@loevy.com
*Counsel for Plaintiff-Appellant*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720-328-5642
elizabethw@loevy.com

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Betty Browning, Administrator of the Estate of Paul Browning, is an individual and has no corporate affiliation.

Plaintiff-Appellant is represented in this Court by David B. Owens and Elizabeth Wang, of Loevy & Loevy, and by the same counsel, along with Luke Busby of Luke Andrew Busby, Ltd., in the district court.

s/ Elizabeth Wang
*Counsel for Plaintiff-Appellant*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.     The Wrongful Conviction of Paul Browning. . . . . . . . . . . . . . . . 3

     B.     A Black Cuban Man Nicknamed "Willy" Killed Elsen . . . . . . . . . 4

     C.     Witnesses Saw "Willy," Not Browning . . . . . . . . . . . . . . . . . . . . . . 6

     D.     Defendants Fabricated Evidence to Support the Wolfes' Obviously False Accusations against Browning. . . . . . . . . . . . . 8

     E.     Defendants Conducted Show-ups . . . . . . . . . . . . . . . . . . . . . . . . . 11

     F.     Browning Was Taken to the Police Station . . . . . . . . . . . . . . . . . 14

     G.     No Reliable Evidence Implicated Browning. . . . . . . . . . . . . . . . . 16

     H.     Defendants Suppressed the Fact that Bloody Shoeprints at the Scene Were Made by the Murderer, Not Browning . . . . . 17

     I.     Defendants Suppressed the Fact that Hugo Elsen Gave a Description of the Murderer that Was Not Browning . . . . . . . 19

     J.     Defendants Used Unduly Suggestive Identification Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     K.     Defendants Tainted the Criminal Proceedings . . . . . . . . . . . . . . 21

L.     Browning Was Wrongfully Convicted . . . . . . . . . . . . . . . . . . . . . . . 23

M.    Browning's Conviction Was Overturned by This Court . . . . . . . 25

N.    LVMPD's Woefully Deficient Policies, Practices, and Failure to Train Caused the Constitutional Violations . . . . . . . . . . . . . . 26

II.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I.    Standards Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.   Having Defendants Ghostwrite An Order And Wholesale Adopting It Was Unfair and Detrimental to the Judicial Process . . . . . . . . . . . . 29

III.  Because Defendants Sought Partial Summary Judgment, Judgment Should Not Have Been Entered On All Claims . . . . . . . . . . 31

IV.  The Record Confirms A Reasonable Jury Could Find For Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     A.    Browning Has Consistently Maintained His Innocence, and the Record Would Permit a Jury to Find Browning Is Innocent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     B.    Browning's Prior Testimony Must Be Considered . . . . . . . . . . . 33

     C.    Consistent with This Court's Prior Decision, a Reasonable Jury Could Find Browning's Due Process Rights Were Violated by the Suppression of Favorable Information . . . . . . . 38

          1.    The record shows Plaintiff's *Brady* claim must be tried . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

          2.    Defendants suppressed favorable evidence . . . . . . . . . . . 43

3.      The suppressed evidence was material . . . . . . . . . . . . . . 44

4.      Defendants acted with deliberate indifference to or reckless disregard for Browning's rights . . . . . . . . . . . . . 48

5.      Browning was not required to seek what Defendants were hiding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.     Plaintiff's Unreliable Identification Claim Must Be Tried . . . . . . . . . . 51

A.      This Claim Was Forfeited and Summary Judgment Is Foreclosed by *Browning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

B.      Defendants Violated Browning's Rights by Generating Unreliable Misidentifications Presented at Trial . . . . . . . . . . . 52

V.      Plaintiff's Fabrication Claim Must Be Tried . . . . . . . . . . . . . . . . . . . . . 57

VI.     Plaintiff's *Monell* Claim Must Be Tried . . . . . . . . . . . . . . . . . . . . . . . 61

VII.    Plaintiff's Fourth Amendment Claim Must Be Tried . . . . . . . . . . . . . . 62

VIII.   Plaintiff's Failure to Intervene Claim Must Be Tried . . . . . . . . . . . . . . 64

IX.     Plaintiff's Conspiracy Claim Must Be Tried. . . . . . . . . . . . . . . . . . . . . . 65

X.      Plaintiff's State-law Claims Must Be Tried . . . . . . . . . . . . . . . . . . . . . 70

XI.     A Different Judge Should Be Assigned On Remand . . . . . . . . . . . . . . 73

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006)....... 52, 53

*Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) ............................... 51

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ............................................... 69

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................... 70

*Avalos v. Baca*, 596 F.3d 583 (9th Cir. 2010).......................................... 67

*Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003)................................... 46, 48

*Baldwin v. Placer Cnty.*, 418 F.3d 966 (9th Cir. 2005).......................... 67

*Banks v. Dretke*, 540 U.S. 668 (2004)...................................................... 51

*Barker v. Morris*, 761 F.2d 1396 (9th Cir. 1985) ................................... 36

*Barton v. Warden, Southern Ohio Correctional Facility*,
  786 F.3d 450 (6th Cir. 2016) ........................................................... 50

*Benavidez v. Cnty. of San Diego*, 993 F.3d 1134 (9th Cir. 2021) ........... 50

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) .............. 63

*Bonamy v. Zenoff*, 362 P.2d 445 (Nev. 1961) ......................................... 72

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................... 1, 26, 42

*Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017).......................... passim

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) .......................................... 65

*Caldwell v. City & Cnty. of San Francisco*,
  889 F.3d 1105 (9th Cir. 2018) ......................................... 52, 58, 63

*Cameron v. Brown*, 721 F. App'x 612 (9th Cir. 2017)........................... 63

iv

*Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ................................. 67

*Carey v. Piphus*, 435 U.S. 247 (1978) ..................................................... 53

*Carrillo v. Cnty. of Los Angeles*,
    798 F.3d 1210 (9th Cir. 2015) ................................... 40, 41, 42, 44

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................... 31

*Chapman v. City of Reno*, 455 P.2d 618 (Nev. 1969) ............................. 72

*City of Los Angeles v. Heller,* 475 U.S. 796 (1986) ................................ 61

*Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090 (9th Cir. 2005) ....... 29

*Costanich v. Dep't of Social & Health Servs.*,
    627 F.3d 1101 (9th Cir. 2010) ...................................................... 58

*Crowe v. Cnty. of San Diego*, 608 F.3d 406 (9th Cir. 2010) ................... 67

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) ........................... 64

*Devereaux v. Abbey,* 263 F.3d 1070 (9th Cir. 2001) .............................. 57

*Dirks v. Martinez*, 414 F. App'x 961 (9th Cir. 2011) ............................ 67

*Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990) ...................... 34

*Ellingson v. Burlington N., Inc.*, 653 F.2d 1327 (9th Cir. 1981) ........... 33

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ............................. 61, 62

*Fatai v. Ramos*, 2023 WL 2392707 (D. Haw. Mar. 7, 2023) .................. 72

*Floyd v. Vannoy,* 894 F.3d 143 (5th Cir. 2018) ..................................... 51

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ...................................... 67

*Fraser v. Goodale*, 342 F3d 1032 (9th Cir. 2003) ............................ 34, 37

*Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982) .......................................... 65

v

*Giglio v. United States*, 405 U.S. 150 (1972) ........................ 40, 42, 44, 45

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999)............... 67

*Graham v. Connor,* 490 U.S. 386 (1989) ................................................. 72

*Grant v. City of Long Beach*, 315 F.3d 1081 (9th Cir. 2002)................... 54

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ................... 52

*Haliym v. Mitchell,* 492 F.3d 680 (6th Cir. 2007).................................... 53

*Harrington v. City of Redwood City*, 7 F. App'x 740 (9th Cir. 2001) ..... 36

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999)..................................... 48

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009).............................. 64

*In re Equifax Inc. Customer Data Security Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021) ...................................................... 29

*In re Slatkin*, 525 F.3d 805 (9th Cir. 2008) ............................................ 37

*Janjua v. Neufeld*, 933 F.3d 1061 (9th Cir. 2019) ................................. 41

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013)....................... 50

*Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002).................................... 67

*Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*,
    110 P.3d 30 (Nev. 2005) ............................................................... 73

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................ 42, 44, 46

*LaMantia v. Redisi*, 38 P.3d 877 (Nev. 2002) ........................................ 71

*Land Baron Inv. v. Bonnie Springs Family LP*,
    356 P.3d 511 (Nev. 2015) .............................................................. 71

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)................... 38

vi

*Levy v. Urbach*, 651 F.2d 1278 (9th Cir. 1981)......................................33

*Liston v. Cnty. of Riverside*, 120 F.3d 965 (9th Cir. 1997).....................49

*Lobato v. LVMPD*, 2022 WL 4017055 (D. Nev. Sept. 1, 2022)...............71

*Lobato v. LVMPD*, 2023 WL 6620306 (9th Cir. Oct. 11, 2023) ..............67

*Love v. Villacana*, 73 F.4th 751 (9th Cir. 2023)....................................40

*Mack v. Williams*, 522 P.3d 434 (Nev. 2022) ........................................70

*Manson v. Braithwaite*, 432 U.S. 98 (1977) ...................................52, 53

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) .......................................63

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir. 1984) ................................64

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) .............. 43, 44, 47, 48, 49

*Memphis Community Sch. v. Stachura*, 477 U.S. 299 (1986) ................53

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016) ................61

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) .....................................................66

*Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001) ................................63

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978) ....................................................................69

*Neil v. Biggers*, 409 U.S. 188 (1972)..........................................52, 53, 55

*Nesmith v. Alford,* 318 F.2d 110 (5th Cir. 1963)....................................65

*Nissan Fire & Marine Ins. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) ...............................................31, 33

*Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*,
841 F.2d 918 (9th Cir. 1988) ........................................................34

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) .................................... 65

*Pace v. City of Des Moines*, 201 F.3d 1050 (8th Cir. 2000) .................... 53

*Paradis v. Arave*, 240 F.3d 1169 (9th Cir. 2001) ................................... 50

*Parsons v. Sanchez*, 46 F.3d 1143 (9th Cir. 1995) ................................. 28

*Photo Electronics Corp. v. England*,
    581 F.2d 772 (9th Cir. 1978) ......................................................... 30

*Posadas v. City of Reno*, 851 P.2d 438 (Nev. 1993) ............................... 71

*Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022 (9th Cir. 2002) ....... 64

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) .................................. 64

*Richards v. Cnty. of San Bernardino*,
    39 F.4th 562 (9th Cir. 2022) ............................................. 58, 61, 62

*Ricord v. C.P.R.R. Co.*, 15 Nev. 167 (1880) ........................................... 73

*Rivera v. Corr. Corp. of Am.*, 999 F.3d 647 (9th Cir. 2021) .................... 71

*Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995) ................................. 64

*Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012 (9th Cir. 2020) .......... 69

*Scafidi v. LVMPD*, 966 F.3d 960 (9th Cir. 2020) ................................... 63

*Sierra Medical Services Alliance v. Kent*,
    883 F.3d 1216 (9th Cir. 2018) ....................................................... 29

*Simmons v. United States*, 390 U.S. 377 (1968) .............................. 53, 56

*Smith v. Marsh,* 194 F.3d 1045 (9th Cir. 1999) .................................... 34

*Smith v. Mulvaney*, 827 F.2d 558 (9th Cir. 1987) ................................. 73

*Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) ............................................. 65

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ........................ 57, 58, 60

*Stovall v. Denno*, 388 U.S. 293 (1967) ................................................. 57

*Tennison v. City and Cnty. of San Francisco*,
570 F.3d 1078 (9th Cir. 2009) ...................................................... 48

*Thomas v. Cnty. of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ............... 61

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) ........................................... 62

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021) .............................. 64, 65

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ........................................... 29, 33

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................... 44

*United States v. Bagley*, 473 U.S. 667 (1976) ........................... 42, 46, 50

*United States v. Beck*, 418 F.3d 1008 (9th Cir. 2005) ........................... 55

*United States v. Birtle*, 792 F.2d 846 (9th Cir. 1986) ........................... 34

*United States v. Bonds*, 608 F.3d 495 (9th Cir. 2010) ........................... 36

*United States v. Butler*, 567 F.2d 885 (9th Cir.1978) ........................... 41

*United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992) ........................ 50

*United States v. Field*, 625 F.2d 862 (9th Cir. 1980) ........................... 53

*United States v. Geiger*, 263 F.3d 1034 (9th Cir. 2001) ........................ 35

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016) ................................. 31

*United States v. Marchini*, 797 F.2d 759 (9th Cir. 1986) ...................... 38

*United States v. McFall*, 558 F.3d 951 (9th Cir. 2009) ........................... 35

*United States v. Poland*, 659 F.2d 884 (9th Cir. 1981) .......................... 35

*United States v. Ramirez Lopez*, 315 F.3d 1143 (9th Cir. 2003) ........... 37

*United States v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998)......... 37, 38

*United States v. Valdez-Soto*, 31 F.3d 1467 (9th Cir. 1994) ................. 38

*United States v. Wade*, 388 U.S. 218 (1967)......................................... 52

*Vargas v. City of Los Angeles,* 2021 WL 2012592
    (9th Cir. May 20, 2021) ................................................................. 62

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
    739 F.2d 1434 (9th Cir. 1984) ................................................. 49, 50

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983) ....................................... 67

*Wearry v. Cain*, 577 U.S. 385 (2016) .............................................. 47, 49

*Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968) ......................................... 65

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ........................... 44, 45

*Woods v. City of Reno*, 2020 WL 4194844 (D. Nev. July 21, 2020)........ 72

*Woodrum v. Woodward Cnty., Okla.*, 866 F.2d 1121 (9th Cir. 1989).....67

*Wray v. Johnson*, 202 F.3d 515 (2nd Cir.2000) ................................... 53

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ........................................... 68, 70

**Statutes**

42 U.S.C. § 1985 ................................................................................. 70

**Rules**

Fed. R. Civ. P. 56.......................................................................... 29, 34

x

xi

Fed. R. Evid. 102 ................................................................ 37

Fed. R. Evid. 804 ................................................................ 35

Fed. R. Evid. 807 ................................................................ 36

## INTRODUCTION

Paul Browning served more than 33 years as an innocent man on death row. Browning's convictions were vacated based on this Court's finding that Browning's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), had been violated. *Browning v. Baker*, 875 F.3d 444, 450 (9th Cir. 2017).

The proceedings below were unfair and improper. Though discovery unearthed additional evidence that Browning's constitutional rights were violated, and despite this Court's prior disposition, the district court concluded no reasonable jury could find liability. The contradiction must be vacated.

To make things worse, the district court did not provide any independent reasoning, instead declaring Defendants winners and having them supply its order. Defendants took liberties with this invitation, ignoring Plaintiff's arguments and authorities, and even granting themselves summary judgment on issues they had not addressed in their motion.

This is unbecoming of the judicial process. The trial court's "decision" includes myriad legal and factual errors, including ignoring

2

Plaintiff's evidence, construing the facts against Plaintiff, misapplying governing law, and ignoring Defendants' forfeiture. Reversal is warranted. Separately, Plaintiff is entitled to a trial on the remaining claims before a different judicial officer on remand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, which is timely. 1-ER-2; 13-ER-2982-83.

## ISSUES PRESENTED

1.      Should this matter be remanded to a new court for trial, following reversal of a decision ghostwritten by Plaintiff's adversary?

2.      Does Paul Browning's death entitle Defendants to a massive windfall by making his prior testimony inadmissible at trial?

3.      Can Defendants obtain judgment as a matter of law on legal claims over which they had not sought summary judgment in the first place?

4.      Could a reasonable jury find in Plaintiff's favor on her claims?

## STATEMENT OF THE CASE

### I.      Facts

#### A.      The Wrongful Conviction of Paul Browning

On November 8, 1985, Hugo Elsen was robbed and killed while working at his Las Vegas jewelry store. 6-ER-1025. The crime was investigated by police officers from the Las Vegas Metropolitan Police

3

Department (LVMPD), including Defendants Branon, Radcliffe, Horn, Bunker, and Leonard.

Paul Browning was not involved in that crime in any way. 2-ER-283-86. Nonetheless, Browning was wrongfully convicted and spent more than three decades on death row, separated from his friends, family, and other loved ones while under the threat of being executed. 13-ER-2903; *Browning*, 875 F.3d at 449.

## B.    A Black Cuban Man Nicknamed "Willy" Killed Elsen

In November 1985, Browning was traveling from California home to North Carolina. He did not live in Las Vegas and was in town for a few days along the way. 2-ER-283; 10-ER-2022.

Browning was staying at the Normandy Hotel when Elsen was murdered. 10-ER-2022. Browning met other Normandy guests Vanessa and Randy Wolfe. 10-ER-2025. Browning regularly saw Randy with a Black Cuban man with shoulder-length, loosely-curled, wet hairstyle. 2-ER-283; 8-ER-1631-32. Browning was friendly with the Wolfes but did not know they were serial criminals. The Wolfes exploited Browning's friendliness. For example, Randy asked to borrow a coat, and Browning's

4

friend Marsha Gaylord lent them a tan jacket. 10-ER-1022-23, 2029-30; 2-ER-283.

The morning of November 8, Gaylord had left her purse at a friend's apartment downtown. 2-ER-283. Browning and Gaylord planned to meet there that afternoon. 10-ER-2026-27. Browning left the hotel around 4:15 p.m., 10-ER 2028-29, and ran into Randy in a yellow Datsun while walking on Las Vegas Boulevard. 10-ER-2028, 2030; 2-ER-284. On his approach to ask for a ride, 10-ER-2032; 9-ER-1958, the Cuban man pushed Browning out of the way, got in the car, and Randy drove off. 10-ER-2032. The Black Cuban man—known to some as "Willy," 9-ER-2000—was wearing the borrowed tan coat and a blue hat. 10-ER-2033; 9-ER-1954-55. The coat and the hat were too small for Browning to wear. 10-ER-2055-57.

"Willy" had darker skin than Browning but was immediately distinguishable given his hairstyle—shoulder-length, loosely-curled, and wet. 10-ER-2092; 9-ER-1954-55; 3-ER-468. Browning's hair was puffy, mostly straight, and dry—an afro. 10-ER-2098; 9-ER-1957; 7-ER-1328-30; 5-ER-898, 950-51; 3-ER-467.

5

Randy told Browning to meet him back at his hotel room. 10-ER-2034; 2-ER-284. Browning went back to the Normandy still hoping for a ride. 10-ER-2035. There, Randy and Willy got into a "cursing match" and Willy left on a bike. 10-ER-2036-37; 2-ER-284. Browning went up to the Wolfes' room, and Randy opened the door. 10-ER-2037. Browning observed tagged jewelry on the bed. Vanessa was removing the tags and putting jewelry into a milk carton. *Id.*; 2-ER-284.

Browning again asked for a ride, and Randy told him he would give him a ride after running an errand. 10-ER-2038. The Wolfes went into the bathroom, Randy came out and put most of the jewelry in a bag and left. *Id.* A couple of watches were left on the floor. *Id.*; 3-ER-305, 316, 327-28, 339-42; 5-ER-983. Vanessa left, while Browning watching TV, waiting for Randy's return. 2-ER-284-85.

### C. Witnesses Saw "Willy," Not Browning

Unbeknownst to Browning, Willy had just killed Elsen wearing the tan coat and blue hat. Frederick Ross confirmed he had seen a Cuban man get out of Randy's car and enter a jewelry shop. 9-ER-1957, 1961. Ross saw the Cuban man enter the store, exit with jewelry, and hurry

6

back to the car. 9-ER-1958, 1968. The Cuban man told Randy, "Let's get out of here. I think I hurt the guy." 9-ER-1959-60; 3-ER-467-68.

After the perpetrator fled, Josy Elsen ran to the business next door and contacted Debra Coe, who returned to the store with her. 6-ER-1047. Coe had likely seen the perpetrator run down the street, though she initially described the suspect as White. *Browning*, 875 F.3d at 451; 5-ER-779; 6-ER-1154. However, Coe later changed her identification to a Black man. *Id.* According to Leonard's report, Coe told him that she observed the perpetrator through a tinted window running away from the store. 6-ER-1047. In her statement, Coe did not identify Browning. *See* 6-ER-1150. However, Radcliffe falsely wrote in the arrest warrant affidavit that Coe identified Browning, stating, "I think it is the same guy. If he had that hat on I would be positive." 6-ER-1098.

Leonard interviewed Charles Woods on November 8, 1985. According to Leonard's report, Woods was standing in front of a different nearby store and "observed a Negro male suddenly come from unknown places and began running down the sidewalk towards them as though he were jogging" and the person had "a blue cap of some type on." 6-ER-

7

1047. Woods described the hat as a cap, with a flat top and no brim. 6-ER-1162-63.

Woods did not see the person come out of the jewelry store; his identification was of someone on the street close to the time of the robbery, not the perpetrator. He reported that the person he saw had no blood on him and nothing in his hands. 7-ER-1504-05.

Leonard spoke to an upstairs neighbor, Brad Hoffman, at the scene. 6-ER-1047. Hoffman told Leonard, "shortly prior to the incident, he observed whom he knew to be a Cuban Male Adult, in his early 20's, with a light moustache, approximately 5-7", and slim build, wearing a blue baseball-type cap, walking down Las Vegas Boulevard." *Id.* Hoffman was "quite sure" "that the subject was a Cuban Male, and not a black male." *Id.*

### D. Defendants Fabricated Evidence to Support the Wolfes' Obviously False Accusations against Browning

Defendants knew the Wolfes had extensive criminal histories; Randy was a known drug addict and Vanessa was a prostitute. 5-ER-975. As Radcliffe stood outside Elsen's store, Randy approached just minutes after the crime. 6-ER-1030. According to Radcliffe, Randy told him that a "negro male" had come to his apartment at the Normandy Hotel, #12,

and told him and Vanessa that he had "just robbed someone and had hurt them bad." *Id.* Randy told Radcliffe that Vanessa was still in the apartment with the suspect. *Id.*; 5-ER-977.

The officers went to the hotel. They went to the Wolfes' room, not Browning's. There, it was Vanessa who led the officers to most of the jewelry found, which was in a cup under the kitchen sink. 6-ER-1060, 1191; 5-ER-913-15, 919; 8-ER-1558-59, 1614; 3-ER-350. Vanessa claimed she "found" the blue baseball cap for the officers and even directed them to a dumpster with a knife in it. 5-ER-915-16, 918-19, 979; 3-ER-345; 6-ER-1139-40.

The Wolfe's account was obviously fantastical and unreliable. 5-ER-977. A reasonably trained officer would have understood, and accounted for, the obvious credibility problems with the Wolfes, particularly as informants. 5-ER-810-12. The Wolfes were known criminals, and all of the alleged physical evidence associated with the robbery/homicide was found in their own room—not Browning's. *Id.*

Nonetheless, Radcliffe wrote the arrest affidavit for Browning based on the Wolfes' "account." 5-ER-979. The information, which would have been fanciful to a reasonably trained officer, included: (1) that

9

Browning, who Randy barely knew, called to Randy from his own room at the hotel; (2) the at-most acquaintance confessed to robbing and killing someone for jewelry; (3) instead of going to examine the jewelry (or hide the knife or clothing) in his own room, the man went to the Wolfes' room and gave the Wolfes the murder-related proceeds; (4) the Wolfes then put the jewelry into a plastic cup and hid it under the sink; (5) he gave the Wolfes the murder weapon (knife) to dispose of for him; (6) he took off his jacket and shirt, supposedly worn during the commission of the offense, and threw them into the Wolfes' closet; (7) he gave the Wolfes a baseball cap to throw in a dumpster; and then (8) he gave Vanessa a ring for helping him. 6-ER-1100-01.

A reasonable officer would have recognized that the Wolfes were obviously lying, suspected their involvement, and recognized that Browning—who had just let them search his room—had not just committed a murder. 5-ER-810-12.

Radcliffe falsely wrote in the affidavit that he "was able to observe a large number of watches and other jewelry items laying on the floor next to the bed." 6-ER-1098. However, the only items visible in the room

10

when the police entered the room were a few watches on the floor. 3-ER-305, 316, 327-28, 339-42; 5-ER-983.

In misleading the criminal justice system about the Wolfes' unreliability, Radcliffe claimed in his report, "Randy frequently has given me information over the last 5 1/2 years that has turned out to be quite correct.…Vanessa…also has given us good information in the past." 6-ER-1030. The claims were false. There was no evidence of this, and it ran contrary to the facts that: the Wolfes "admitted that they used heroin and cocaine, that Vanessa was a prostitute, and that Randy stole property"; Randy had prior convictions; Randy admitted to keeping some of the stolen jewelry; and Vanessa used to "bilk people out of their money." *Browning*, 875 F.3d at 466.

The Wolfes openly wore and admitted to keeping the stolen jewelry after the robbery. 8-ER-1619. They also admitted having previously stolen things to buy narcotics. 8-ER-1537-39, 1587-88.

### E.  Defendants Conducted Show-ups

Shortly after Vanessa left the Wolfes' room (#12), Bunker and Radcliffe kicked down the door. 6-ER-1029, 1060. Though there was no

11

probable cause to suspect Browning, Browning was arrested. 10-ER-2039; 5-ER-913; 6-ER-1059-60.

Browning was shirtless, had not been wearing a hat that day, and put into a police car. 10-ER-2040-41; 2-ER-285, 290. At this point, there was no exigency or ongoing action. Still, in a departure from accepted practices at the time, rather than taking Browning to the station, Radcliffe and Leonard conducted a series of suggestive, and unnecessarily gratuitous, show-ups with Browning behind the jewelry store, sitting there shirtless, handcuffed, and obviously "the accused." 2-ER-285; 5-ER-782-90, 812-15, 923, 979-80, 1000-01; 6-ER-1048-49; 8-ER-1522, 1636-37. Defendants did not take Browning out of the car. 8-ER-1523. Just before the show-up, Browning asked the detectives for a coat to put on. They asked if he had one in his room and he said he did. The detectives told Browning that if he signed the consent to search form, he would get the coat. Browning signed the form. 10-ER-2042; 6-ER-1242.

The search of Browning's room (#15) turned up nothing related to the homicide; no jewelry, blood stains, bloody clothes, or large sums of money. 6-ER-1016-1311. Defendants did not even bother to document

12

Browning's room, electing to take pictures of the Wolfes' room and items the Wolfes pointed out. 3-ER-292-350.

Back in the car at the show-ups, Browning remained shirtless, handcuffed, and without a jacket or cap. 10-ER-2044, 6-ER-1049. Though they could have separated the witnesses (Hoffman, Coe, and Woods), Defendants conducted a simultaneous show-up with all three witnesses. 6-ER-1050. Before the show-up, Coe was told she would be asked to "identify the man they had picked up." *Browning*, 875 F.3d at 543; 8-ER-1640. Even then, she did not identify Browning as the perpetrator—a fact that is unsurprising given her poor vantage point and the fact Browning is innocent. Instead, Coe said Browning "resembled" the "man that ran across the front window," and would not "point a finger at him because I can't be positive." 6-ER-1154. Coe also stated that she would never be able to be "more sure" in her mind that it was "the man" or not than "tonight when [she] first saw him," and that when she sees Black people, "they all look the same" to her. 6-ER-1155. In addition, when she was interviewed at the station, Coe said that she looked out the window when Josy Elsen came over and saw a man running by, who she described as Black, wearing a blue hat, and with curly hair just past the ears. 6-ER-

13

1151. Coe's statement that she thought Black people look the same confirms her "identification" of Browning was unreliable. 5-ER-814.

Woods was also shown Browning and claimed he could positively identify him. 6-ER-1049. Police told Woods they had a suspect and presented Browning shirtless and arrested. 8-ER-1638. When Woods was interviewed about the show-up, he said, "I'm sure he was the same fellow that passed me within three feet on the street, a short while before." 6-ER-1166. Woods did not see the guy carrying anything in his hands, 6-ER-1163, and he had no blood on him. 7-ER-1504-05.

Hoffman did not identify Browning, and confirmed to Leonard and Radcliffe Browning was not the person he had seen; that person was "definitely a Cuban male," and not a Black male. *Id.*

### F. Browning Was Taken to the Police Station

Browning was taken to the station and handcuffed in a room. 10-ER-2045-46. Radcliffe told Browning he had been arrested for murder, it was over, and he confess in order to escape the death penalty. 10-ER-2048. Browning was scared, had not committed the murder, and was uncomfortable sitting under an air conditioner shirtless for hours. 10-ER-

14

2050; 2-ER-285. So, he took of the cuffs and tried to leave but was stopped and then returned to the room without incident. 2-ER-285-86.

Detective Levos asked Browning whether he wanted to make a statement. Browning assented and recounted what happened. Levos wrote this down. Levos balled the paper up and said, "you want to try it again." Browning invoked his right to counsel. 10-ER-2053; 2-ER-286.

Defendants attempted to obtain an identification from Josy Elsen despite the fact that, as Levos reported, Josy could not describe the perpetrator, could only remember a blue cap, 6-ER-1041, and had an obstructed view. 5-ER-766.

Leonard showed Josy two photo arrays almost a month later and she "immediately explained" "she did not think that she would be able to identify the subject, that she only saw him for a slight moment from the side…[she] never saw him full face and did not think she would be able to pick him out." 6-ER-1070. Browning's photo was in the first array, but it was "quite apparent" Josy could not make an identification. *Id.*

After Browning's arrest, LVMPD generated reports that included false information about Betty Browning, claiming she called the LVMPD

15

and reported inculpatory information. This never happened. 13-ER-2902; 6-ER-1051-52.

### G. No Reliable Evidence Implicated Browning

Browning's fingerprints were not found on any of the jewelry. 5-ER-1010. Browning's print was found on his own watch (a worn Casio missing a band). 3-ER-335; 10-ER-2076-78; 11-ER-2314; 6-ER-1190.

There is a print belonging to Browning from Elsen's store, and it has nothing to do with the crime. Browning had been in the jewelry store with Gaylord a few days before the murder, 10-ER-2063; 2-ER-283-84, and left his prints from how he leaned over and touched the display case (including leaning over to touch parts of the vendor's side). 11-ER-2314-15; 5-ER-1004-05; 6-ER-1227; 11-ER-2317-18; 10-ER-2063-65.[1]

---

[1] There is also a print from a piece of glass on the ground, which was broken during the commission of the offense. None of the contemporaneous reports identify where this fragment came from, 11-ER-2318-20, 5-ER-1005, 1009, 1011; 3-ER-354, 399, 411, 420-22, 458. Horn now claims the fingerprint came from the mirrored side of the glass (as a mechanism of suggesting Browning's guilt). Horn's new statement—which contradicts his reports and logic—was first made during discovery, 37 years after the fact. 5-ER-1011. A jury is entitled to reject this self-serving account.

16

### H. Defendants Suppressed the Fact that Bloody Shoeprints at the Scene Were Made by the Murderer, Not Browning

Branon was the first to arrive at the jewelry store. 12-ER-2650. Only the Elsens were there at the time, and the doors were locked. 12-ER-2650; 5-ER-937. Radcliffe and Robertson arrived at approximately the same time moments after Branon. 6-ER-1034.

These officers saw bloody shoeprints made by sneakers near Hugo Elsen when they arrived. 12-ER-2650; 7-ER-1315, 1319; 3-ER-388, 390-97, 403, 408-09, 4124, 424, 443-46; 5-ER-941. Both Horn and Branon knew the shoeprints led away from Mr. Elsen to the front door; *i.e.*, they belonged to the perpetrator because they were *on top of the* bloody mess and observed before paramedics arrived. 6-ER-1228, 1289; 5-ER-937, 1098; 3-ER-426-27, 430, 433; 7-ER-1380.

The bloody shoeprints were not made by Josy Elsen or Debra Coe. 5-ER-937, 948, 1002; 3-ER-471. The shoeprints were not made by Browning (who is innocent), and Defendants knew the bloody shoeprints were not made by Browning. 7-ER-1381; 11-ER-2333-34.

Branon and Horn knew the bloody shoeprints were made by the perpetrator's shoes and that they did not match Browning's shoes, which were black loafers with no tread. 11-ER-2336-37; 6-ER-1196, 1230; 12-

17

ER-2650; 5-ER-949, 1000, 1003. Branon and Horn knew, or should have known, the prints belong to the killer. 5-ER-937, 939, 1002.

Branon, Horn, and Radcliffe knew the bloody shoeprints were important but did document them, 12-ER-2665; 5-ER-937-39, 972-73; 6-ER-1034-36, and did not document the fact they knew the shoeprints could not have been made by the paramedics who arrived after they had already seen the shoeprints. 12-ER-2666-67; 5-ER-937, 1002-03. Branon and Horn even discussed with detectives—including Bunker and Leonard—that the shoeprints were already there when they arrived. 5-ER-911, 939; 6-ER-1035, 1040, 1058; 12-ER-2665.

The importance of the bloody shoeprints was obvious and discussed by Detectives Levos and Leonard, who asked Horn to check Browning's shoes for a match. 5-ER-1006-07; 6-ER-1261. Defendants' discussions indicating they knew the shoeprints were there before the paramedics arrived were not memorialized in any report and were not otherwise disclosed to the prosecution or the defense. *See Browning*, 875 F.3d at 461; 6-ER-1016-1311.

18

## I. Defendants Suppressed the Fact that Hugo Elsen Gave a Description of the Murderer that Was Not Browning

When Branon entered the store, Josy told them that her husband had been stabbed. 5-ER-937. Hugo was alive and lucid. 5-ER-944; 12-ER-2652. Branon questioned Hugo about the perpetrator's attributes, including the hairstyle, hair type, color, and length. 5-ER-944. Branon asked if the suspect had a puffy afro with tight curls; Hugo said no, it was shoulder-length loose curls and wet-looking. 5-ER-943; 12-ER-2661. Hugo *himself* described the perpetrator's hair as shoulder-length, wet, loosely-curled and did *not* say the hair was a "Jheri curl." 5-ER-943.

Despite the true source of the information, Branon wrote:

> Between the two of them, Mr. and Mrs. Elsen, I was able to obtain a partial suspect description, and with the help of a white female adult witness, who observed the suspect flee the area, I was able to get a rather complete description of the suspect, who was described as a black male adult in his late 20's, medium complexion, wearing a blue baseball cap, a blue windbreaker type jacket, blue levis, bearing a mustache and, what was described as shoulder length geri curled type hair.

6-ER-1034. Branon did not write in his report that it was Hugo Elsen who gave the description of the suspect, or that Hugo said the hair was shoulder-length, wet-looking, and loosely-curled. 5-ER-945. Although Hugo was the one who gave him the description of the hair, Branon

19

lumped in three witnesses into his description—Hugo, Josy, and the "white female adult witness" (Coe)—and the report reads as if it was really the third witness—Coe—who was able to make the "partial suspect" description "rather complete" and not the dying declarations of Hugo Elsen himself. 5-ER-944; 12-ER-2653-54.

Branon knew the perpetrator was not Browning (he knew Browning had an afro) and Branon was surprised Browning was arrested. 12-ER-2661. Still Branon did not disclose the exonerating information he received directly from Hugo Elsen.

### J. Defendants Used Unduly Suggestive Identification Procedures

The identification procedures were gratuitous, suggestive, tainted, 5-ER-784-85, 790; 5-ER-812, and caused Browning to be misidentified and departed from generally accepted police practices, extant in 1985. 5-ER-809, 812-16. Indeed, an innocent person is more than "twice as likely to be misidentified in a show-up procedure as in a lineup." 5-ER-785.

Having three witnesses view the show-up simultaneously was contrary to generally accepted police practices and procedures in 1985, which defendants well knew, *id.*; 5-ER-984. Coe testified at trial that the police told her that they had a suspect they wanted her to look at and

20

that they took off his clothing so she "wouldn't be impressed." 7-ER-1452. This instruction had the effect of suggesting that Browning was wearing clothing that fit the description of the suspect, and they took it off; *i.e.*, he was the correct suspect. 5-ER-785. These statements were unduly suggestive. 5-ER-790.

Woods was also told before the show-up that the police "had a suspect in this murder and would I take a look at the man they had." 7-ER-1462. This was also unduly suggestive. 5-ER-785-86, 790. All of the "identifications" were made under suggestive circumstances. 5-ER-788.

### K.    Defendants Tainted the Criminal Proceedings

Owing to poor observational opportunity, Coe did not get a "long look at the person or much of a full face view" 5-ER-767. The person was wearing a hat, and he was of a different race, "making identification accuracy less likely." *Id.* Thus, "it is highly unlikely that Coe ever formed a solid memory of the person's face sufficient to support any identification." 5-ER-767-68. And, at most, Charles Woods had a brief opportunity to view the person he saw, but the person's face was obscured by a hat and he was of a different race. 5-ER-768.

All witnesses in this case experienced influences known to decrease identification accuracy, including some or all of the following: weapons focus, brief exposure, lack or diversion of attention to the perpetrator's face, a cross racial target, trauma/stress, and the presence of disguise (the hat). 5-ER-773. Defendants permitted contamination even apart from the simultaneous show-ups by allowing giving them the opportunity to discuss the event and discussing the event with multiple witnesses. 5-ER-775-76, 779, 789.

Josy Elsen was unable to identify any suspect when she was interviewed on the day of the robbery and could not identify anyone in the photo lineups conducted a month after the robbery. *Browning*, 875 F.3d at 451. Yet, by the time of trial fourteen months later, she claimed she was able to identify Browning. 5-ER-778. As a matter of science, "[t]his can only be the result of…post-event influences," including seeing Browning's photo in the lineup. 5-ER-778-79. Josy had also seen Browning at more than a dozen preliminary hearings where he was presented as the accused prior to her trial testimony. 5-ER-779. In-court identifications are inherently suggestive, and they are not probative when they differ from earlier reports. 5-ER-787, 790. Coe's

22

misidentification of Browning at trial was also the result of post-event contamination. 5-ER-779.

### L. Browning Was Wrongfully Convicted

When Browning was charged, the entirety of evidence against him did not establish probable cause, because it was based on documents containing false statements (such as Radcliffe's arrest affidavit) and unreliable "identifications" resulting from undue suggestion, and because Defendants did not reveal the exculpatory information known to them.

The matter proceeded to trial. Browning was wrongfully convicted based upon three things: the testimony of (1) Josy Elsen, Debra Coe, and Charles Woods, who misidentified Browning (despite his innocence and contrary to their prior statements that they could not make an identification of Browning (Josy), could not identify anyone at all (Coe), and did not see the perpetrator (Woods)); (2) the Wolfes' testimony; and (3) testimony by LVMPD police officers who failed to disclose the false or misleading statements in their reports, the exculpatory information they knew, and without ever admitting they knew Browning was not the perpetrator.

23

Enabled and emboldened by Branon's withholding of the fact that Hugo Elsen gave him the description of the suspect's hair as shoulder-length, wet-looking, and loosely-curled, the prosecution argued in closing that whoever gave the description "Jeri-curl" to Branon did not know the difference between the hairstyles of Black people; *i.e.,* the difference between a Jheri curl and an afro. *Browning,* 875 F.3d at 463; 9-ER-1830.

Browning's defense also involved pointing out the bloody shoeprints pointed to an alternative suspect. Horn, enabled and emboldened by suppression of the fact the shoeprints were there before the paramedics, testified that paramedics and off-duty detectives often wear tennis shoes; misleadingly suggesting the shoeprints might have come from someone other than the perpetrator. *Browning,* 875 F.3d at 461; 7-ER-1382-83.

Browning was convicted and challenged his conviction, including a via a state habeas petition that led to a 1999 evidentiary hearing. 9-ER-1946–13-ER-2855. Suppressed exculpatory information was first revealed to Browning at the hearing. For example, Branon first disclosed to Browning that Elsen himself had description of the perpetrator's hair, and that it was shoulder-length, loosely-curled, and wet (*i.e.,* that he did not say it was a Jheri curl). 5-ER-936, 945, 954, 985, 993; 12-ER-2652-53,

24

2667. Likewise, Browning first learned the police knew bloody shoeprints were from the perpetrator (because they were there before the paramedics arrived), testimony directly contrary to Horn's suggestion paramedics or officers left the prints. *Browning*, 875 F.3d at 461; 12-ER-2665-67. Branon first disclosed that he knew Browning was not the perpetrator, including based on hairstyle. 12-ER-2661. Branon, a Black man, certainly could have been a powerful defense witness in rebutting the racially-charged closing argument made by the prosecution.

The prosecutor did not know of the exculpatory information suppressed by Defendants, which he would have produced. 5-ER-954, 987, 993; 12-ER-2623-24.

### M.   Browning's Conviction Was Overturned by This Court

The state *habeas* petition ended up in federal court where this Court found Browning had cleared the standards set forth in 28 U.S.C. § 2254—requiring not only an incorrect decision but an unreasonable application of United States Supreme Court precedent. *Browning*, 875 F.3d at 459. Discussed further below, this Court recognized the identification evidence was "significantly flawed," and the result "highly suggestive" procedures, *id.* at 468, and that the suppressed evidence

about the shoeprints, about Hugo describing the hairstyle, etc. was *Brady* material whose suppression harmed Browning, because "there is a reasonable probability that had the concealed evidence not been withheld, the jury would have reached a different result." *Id.* at 463.

The charges against Browning were dismissed and he was released.

### N.    LVMPD's Woefully Deficient Policies, Practices, and Failure to Train Caused the Constitutional Violations

The failures of LVMPD officers here were no accident. Due to the inadequate training and policies by LVMPD, Defendants were not familiar with their obligations to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and did not know how to conduct proper identifications. 4-ER-476-756, 5-ER-807, 818, 909-11, 922, 924, 927, 940-41, 963, 967, 995, 1007-08. The entire policy, a single sentence in a manual, 4-ER-522, was inadequate.

## II.    Procedural History

In July 2020, Browning filed this suit. 13-ER-2952. Browning died early in discovery. Browning's mother, Betty Browning, administers the estate and was substituted. 13-ER-2919-20.

After discovery, Defendants LVMPD, Bunker, Leonard, Branon, Radcliffe, and Horn moved for partial summary judgment. 5-ER-823.

Defendants did not address suggestive identification claim or that LVMPD is liable for that violation. *See* 5-ER-823-76. Defendants also did not fully address Plaintiff's fabrication claims. 5-ER-857.

Plaintiff's response to summary judgment explained in great detail why genuine disputes of material fact required a trial against Branon, Radcliffe, Bunker, Horn, Leonard, and LVMPD. 2-ER-115-201. Plaintiff pointed out that Defendants had forfeited any argument for dismissal of claims they did not address in their motion. *See* 2-ER-129, 171. In reply, Defendants argued for the first time the suggestive identification and fabrication claims should be dismissed and that Browning's prior testimony was inadmissible. 2-ER-90-92, 98-104.

Without any discussion of its reasoning or a hearing, the district court declared Defendants had prevailed on *all* claims and directed them to write an order "consistent with" that pronouncement. 1-ER-38. Defendants submitted an order that mostly cut-and-paste from their briefs. *Compare* 2-ER-46-80 *with* 5-ER-823-876 and 2-ER-80-112. Plaintiff objected, 2-ER-40-43, and was overruled, 1-ER-3-4. The court adopted Defendants' order without substantive change, 1-ER-5-37, and entered judgment. 1-ER-2. This appeal followed. 13-ER-2982-83.

27

## SUMMARY OF THE ARGUMENT

The district court's disposition of this case was fundamentally unfair and deeply flawed. Defendants were permitted to ghostwrite a decision that was rubber stamped by a court, despite its factual and legal inaccuracies. As a result, the district court ignored entirely the fact that Defendants' motion for summary judgment was partial; it did not address all of Plaintiff's claims. Reversal is warranted on those claims.

This Court should also reverse the grant of summary judgment on other counts and order a trial. The decision below ignores the disputes of material fact, construes the evidence against Plaintiff, and rests on myriad legal errors about the way § 1983 claims work. Remand to a new judicial officer is appropriate here.

## ARGUMENT

### I.    Standards Of Review

Each issue presented here—the trial court's legal error by permitting Defendants to write their own decision, the failure to find forfeiture below, and the grant of summary judgment—is reviewed *de novo*. *See, e.g.*, *Parsons v. Sanchez*, 46 F.3d 1143 (9th Cir. 1995).

Summary judgment is permitted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

28

of law." FED. R. CIV. P. 56(a). Where "'evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" a genuine issue of material fact exists. *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018). The evidence must be construed "'in the light most favorable to the opposing party,'" and the court must also "draw inferences in favor of the nonmovant." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment," including from "direct and circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005).

## II. Having Defendants Ghostwrite An Order And Wholesale Adopting It Was Unfair And Detrimental To The Judicial Process

Courts have "'repeatedly condemned the ghostwriting of judicial orders by litigants,' and cases admonishing courts for the verbatim adoption of such orders are 'legion.'" *In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1268 (11th Cir. 2021). In determining whether to vacate the adoption of a proposed order, courts have examined whether "'the process by which the judge arrived at [the order] was fundamentally unfair.'" *Id.*

Here, the process was fundamentally unfair. The district court gave no indication whatsoever of the basis for its decision; nor did it hold a hearing at which it explained its ruling orally and then ordered a party to memorialize that in writing. Instead, the district court issued a one-sentence entry stating that it had read Defendants' motion (which did not mention Plaintiff's response) and declared Defendants were entitled to dismissal of all of Plaintiff's claims even though Defendants' motion had not addressed all of Plaintiff's claims.

Egregiously, the district court adopted the proposed opinion wholesale, even though it was nearly identical to Defendants' motion for summary judgment, evincing a failure to engage in any independent judicial assessment of the record or the law. Situations that "raise the possibility that there was insufficient independent evaluation of the evidence" that cause "the losing party to believe that his position has not been given the consideration it deserves" are disfavored. *Photo Electronics Corp. v. England*, 581 F.2d 772, 777 (9th Cir. 1978).

The absence of a fair judicial process or independent evaluation is not merely a "possibility" here. It is a certainty. This was error.

### III. Because Defendants Sought Partial Summary Judgment, Judgment Should Not Have Been Entered On All Claims

Defendants did not move for summary judgment on Plaintiff's claim that they violated his due process right to a fair trial by using unduly suggestive procedures to generate unreliable misidentifications or fabricated evidence, *see* 5-ER-823-76, 857. Defendants first addressed these claims in reply. 2-ER-98-104. The arguments were forfeited. *E.g.*, *United States v. Lo*, 839 F.3d 777, 787 n.3 (9th Cir. 2016).

These forfeiture rules must be enforced at summary judgment. Defendants bore "the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of the record which they believed "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To carry their burden, Defendants were required to "produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Failing to mention the claims, Defendants necessarily failed to meet their burden

31

and should not have been granted summary judgment on these grounds. Remand for trial is required.

## IV. The Record Confirms A Reasonable Jury Could Find For Plaintiff

### A. Browning Has Consistently Maintained His Innocence, and the Record Would Permit a Jury to Find Browning Is Innocent

This suit is premised on the fact that Paul Browning did not kill Hugo Elsen. 13-ER-2917-51. Browning has sworn to his innocence in a 1989 affidavit, and in testimony from the 1999 hearing. 2-ER-282-86; 10-ER-2020-2103.

This is not the only evidence that would permit a reasonable jury to find that Browning is innocent. As discussed above, there is evidence that would permit a reasonable jury to find Browning innocent (and that Defendants knew he was innocent). For one, a jury could accept the evidence about "Willy." Browning's shoes could not have been the bloody shoeprints that were left by the perpetrator. Browning could not have been the perpetrator (he had an afro, not wet, loose and long hair), and the officer who spoke with the victim before he passed was surprised Browning was arrested due to the disparity. And, the only "evidence" ever generated against Browning is tainted, fabricated, or flawed.

In other words, while Browning's sworn statements should have been considered at summary judgment, they are not at all necessary to properly construing the record on the premise that, at trial, Plaintiff can (and intends to) prove that Browning is innocent, regardless of whether that is through circumstantial evidence or with direct evidence, too. Either way, the fact of Browning's innocence—and the inferences that flow from it—must be accepted at this juncture. *Tolan*, 134 S. Ct. at 1866.

## B.   Browning's Prior Testimony Must Be Considered

In their motion Defendants ignored Browning's innocence. Then, for the first time in reply they claimed Browning's prior testimony and affidavit asserting his innocence inadmissible. 2-ER-90-91. Failing to acknowledge this known contradictory evidence alone warranted denial of the motion, as Defendants could not meet their initial burden. *Nissan Fire*, 210 F.3d at 1006.

Like the substantive claims unmentioned in their motion, Defendants forfeited the argument that Browning's account should not be considered, as failure to raise the evidentiary issue waives the challenge, *Ellingson v. Burlington N., Inc.*, 653 F.2d 1327, 1332 (9th Cir. 1981); *Levy v. Urbach*, 651 F.2d 1278, 1280 n.3 (9th Cir. 1981), and new

33

issues first raised in reply are waived, too. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

Forfeiture aside, it was error to exclude Browning's prior sworn statements. First, at "the summary judgment stage" courts "do not focus on the admissibility of the evidence's form" but "instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F3d 1032, 1036 (9th Cir. 2003). Witnesses and parties are permitted to present affidavits, declarations, and other forms of evidence to show a genuine issue of fact for trial. FED. R. CIV. P. 56(c)(4). So, the notion Defendants first raised in reply, and then ghostwrote into the decision below, is simply asking the wrong question at this juncture.

Regardless, Browning's prior testimony is admissible under Federal Rules of Evidence 804(b)(1) and 807(a), and the affidavit is admissible under Rule 807(a) as well.

Rule 804(b)(1) permits admission of former testimony where (1) the declarant is unavailable; (2) the testimony was given as a witness at a trial, hearing, or deposition, whether given during the current proceeding or a different one; and (3) the opposing party or their predecessor in

34

interest had a prior opportunity and similar motive to develop testimony by direct, cross- or redirect examination. FED. R. EVID. 804(b)(1).

Browning is deceased and thus unavailable. FED. R. EVID. 804(a)(4); *United States v. Yida*, 498 F.3d 945, 952 (9th Cir. 2007). Browning's testimony was given at an evidentiary hearing during postconviction proceedings. FED. R. EVID. 804(b)(1)(A). Defendants' predecessor in interest, the State of Nevada, had a prior opportunity and similar motive to develop testimony in cross-examination during the 1999 postconviction hearing. FED. R. EVID. 804(b)(1)(B). The state habeas proceedings were adversarial, and the State of Nevada adequately represented Defendants' interests by vigorously examining and cross-examining the witnesses—some of whom are the Defendants here—and defending Browning's conviction. *See United States v. McFall*, 558 F.3d 951, 964 (9th Cir. 2009); *United States v. Poland*, 659 F.2d 884, 896 (9th Cir. 1981); *United States v. Geiger*, 263 F.3d 1034, 1039 (9th Cir. 2001). With all three conditions met, Rule 804(b)(1) applies.

Browning's prior testimony and the affidavit are admissible under Rule 807(a), which permits admission of hearsay if "the statement is supported by sufficient guarantees of trustworthiness" and "is more

35

probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." FED. R. EVID. 807(a).

This rule provides judges latitude to admit statements that would otherwise be hearsay. *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010).[2] The inquiry involves "a practical concern for the truth-determining process." *Barker v. Morris*, 761 F.2d 1396, 1400 (9th Cir. 1985).

Browning's testimony is the most probative about what happened to him; so that is not at issue.

In addition, the truth-determining process and basic fairness demand Browning's testimony and affidavit be admitted. For one, the only reason that they would even potentially be considered as "hearsay" at the summary judgment phase is because Browning died during this lawsuit. Admission is appropriate in that circumstance. *See, e.g., Harrington v. City of Redwood City*, 7 F. App'x 740, 743 (9th Cir. 2001). Indeed, where—as here—statements should be admitted, exclusion is

---

[2] Because the court below did not exercise any independent judgment on this issue, which was also forfeited, this Court should review this question *de novo* rather than under the abuse of discretion standard.

reversible error. *United States v. Sanchez-Lima*, 161 F.3d 545, 547 (9th Cir. 1998).

Defendants are not entitled to a windfall in these circumstances—especially where their misconduct contributed to Browning's demise as a result of poor medical care for three decades on death row. Buttressing Rule 807, the Federal Rules do not require—or permit—such an unfair result and must be administered to "the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102.

To be sure, the truth-determining process would be undermined by the exclusion of Browning's trustworthy account. Though even unsworn statements might qualify, *Fraser*, 342 F.3d at 1036-37, Browning made the affidavit and testified under oath. *Cf. United States v. Ramirez Lopez*, 315 F.3d 1143, 1153 (9th Cir. 2003). Courts evaluate whether criminal consequences could attach, *In re Slatkin*, 525 F.3d 805, 812-13 (9th Cir. 2008), and Browning testified knowing that he could be subject to prosecution for perjury or remain subject to execution if he lied and the court found that his lack of credibility doomed his claims. Trustworthiness is evident because the affidavit and testimony reflect Browning's personal knowledge and do not constitute a recantation.

37

*United States v. Marchini*, 797 F.2d 759, 763 (9th Cir. 1986). Browning has steadfastly maintained his innocence. The affidavit (2-ER-282-86) and testimony (10-ER-2020-2103) are both cogent narratives recounting the events of November 8, 1995 and raise no concerns with perception, memory, or sincerity, another indicia of trustworthiness under Rule 807. *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994) Indeed, as another factor, the sworn statements are both consistent and corroborated, both with one another, as noted in *Larez v. City of Los Angeles*, 946 F.2d 630, 643 n. 6 (9th Cir. 1991), and *Sanchez-Lima*, 161 F.3d at 547, and they are consistent with sworn testimony from witnesses Hoffman, Branon, and Yates from Browning's original trial and even the testimony of two experts in the post-conviction proceedings. 11-ER-2225-2344.

## C. Consistent with This Court's Prior Decision, a Reasonable Jury Could Find Browning's Due Process Rights Were Violated by the Suppression of Favorable Information

This Court's prior decision found a *Brady* violation related to the suppression of exculpatory information related to the bloody shoeprints, the description of the perpetrator (having come from Elsen, and being reported to Branon precisely not as a Jheri curl). The record below

38

includes *more* information about the liability of the defendants and *zero*

information that would undermine this Court's prior findings that:

- Information regarding the bloody shoeprints—known to Branon, Radcliffe, Horn, Bunker, and Leonard—was exculpatory, material, and suppressed. *Browning*, 875 F.3d at 461, 464, 466.

- Information regarding Hugo Elsen's description of the killer's hair—known to Branon—was exculpatory, material, and suppressed. *Id.* at 463-67.

- Relevant to materiality, "the evidence at trial was remarkably weak," including because the case "relied on flawed identifications and the Wolfes' unreliable testimony." *Id.* at 466-67. This issue— decided already by this Court—specifically includes that the Wolfe's testimony was "unreliable." *Id.*

- The misidentifications of Browning were flawed and unreliable. *Id.* at 467.

As a result, these conclusions should have guided the district court.

*Browning* is binding. Yet, the court below did not even consider this

analysis or provide a reason for reaching conclusions diametrically

opposed to *Browning*, regardless of whether preclusion applied. Applying

this precedent, the Court should have denied the motion. And, this Court

can now reverse on this basis as well.

If the Court were inclined to address elements of issue preclusion—

which is not necessary to find that *Browning* should control—the only

disputed element is whether Defendants had a full and fair opportunity

to litigate the issues in *Browning*. *See Love v. Villacana*, 73 4th 751, 754 (9th Cir. 2023) (providing elements). The district court surmised Defendants lacked a full and fair opportunity because (1) Defendants were not parties to the *habeas* proceedings and (2) federal *habeas* review has different standards than § 1983 liability under current law. 1-ER-21-22. The reasoning is faulty.

Defendants had a full and fair opportunity to present all of the exculpatory information they hid for decades in the original proceedings, and in the evidentiary hearing where some of them testified. Defendants are all police officers, sworn to uphold the Constitution, who knew (or should have known) of their obligation to produce material evidence to Browning during the course of the original prosecution in 1985. That is the core holding of *Brady*, decided in 1963, and other cases in the same line that followed, such as *Giglio v. United States*, 405 U.S. 150 (1972) and *Carrillo v. Cnty. of Los Angeles,* 798 F.3d 1210, 1219 (9th Cir. 2015), which recognized it was clearly established by 1978 that police officers were bound to disclose material evidence.

Below, Defendants tried to suggest they were mere "witnesses" in the proceedings, essentially negating their constitutional duty to disclose

40

exculpatory information. But, in 1978, this Court held that "investigative officers are part of the prosecution" *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978). *Butler* "thus made unmistakably clear that police officers and prosecutors alike" share an obligation to disclose "pertinent material evidence favorable to the defense." *Carrillo*, 798 F.3d at 1220 (cleaned up).[3] The upshot is that, given the unique *Brady* obligation and Defendants being "part of the prosecution" Defendants had a "full and fair" opportunity to disclose material evidence under their constitutionally required duty in the criminal prosecution and that did not abate simply because they managed to hide material evidence until long after Browning was convicted.

Second, the differences between federal habeas and § 1983 are immaterial to the application of issue preclusion. The issues identified above were litigated and decided by this Court; that is all that is required. *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019).

Again, Plaintiff's argument is not contingent on preclusion, and the question could be skipped. *Browning* is precedent that the trial court

---

[3] There is no dispute *Brady* obligations were clearly established in 1985; Defendants' proposed and adopted order did not address this issue.

41

should have followed and its conclusions confirm, at minimum, a reasonable jury can find for Plaintiff on the *Brady* claim.

### 1.    The record shows Plaintiff's *Brady* claim must be tried

The record demonstrates that Plaintiff's *Brady* claim must proceed to trial because there is beyond sufficient evidence for a reasonable jury to find for Plaintiff (including without Browning's testimony).

The Due Process Clause requires police to affirmatively produce material information—*i.e.*, exculpatory and impeachment information—to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). The State's suppression of evidence favorable to the defense violates due process where that evidence is material, *Giglio v. United States*, 405 U.S. 150 (1972), and material information includes impeachment evidence and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1976). The disclosure obligation extends to evidence that would impeach the quality of an investigation. *Kyles v. Whitley*, 514 U.S. 419, 449 (1995).

In this Circuit, a plaintiff must show: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer "'acted with deliberate indifference to or reckless disregard for an

42

accused's rights or for the truth in withholding evidence from prosecutors." *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018).

### 2. Defendants suppressed favorable evidence

The suppressed evidence includes:

- The fact Hugo Elsen himself gave a description of the perpetrator as having "shoulder length," "loosely curled," and "wet" hair, which could not have been Browning, and that Elsen not use the phrase "Jheri curl."

- That the bloody footprints, were there when the first-arriving officers arrived, countering the contention that they were not the perpetrator's.

- Evidence that Defendants knew about the Wolfes' unreliability and tried to vouch for their incredible story falsely implicating Browning.

- Defendants' own misconduct in fabricating evidence and material omissions in their reports that bolstered their fabrications.

- The full extent of the tactics taken to obtain the misidentifications of Browning that were introduced at trial.

It is undisputed that the evidence above was not disclosed to Browning before his criminal trial. The suppressed evidence is favorable; it is exculpatory and/or impeachment. The hairstyle and shoeprint evidence showed that Browning did not commit the crime and enabled

him to point to an alternative suspect; *i.e.*, "Willy" the Black Cuban. This is "classic *Brady* material." *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010); *see Carrillo*, 798 F.2d at 1219-25. The other categories— impeaching the Wolfes and the officers themselves—is material, *Giglio*, 405 U.S. at 154, as would be the information permitting Browning to "attack on the integrity of the investigation." *Kyles*, 514 U.S. at 449.

### 3.    The suppressed evidence was material

Whether the suppression harmed plaintiff concerns materiality. *Mellen*, 900 F.3d at 1096-97. Evidence is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Materiality also turns on the strength of the evidence against the accused. *See United States v. Agurs*, 427 U.S. 97, 113 (1976). When multiple pieces of information or evidence are at issue, the question of materiality must be considered cumulatively, rather than with each piece in isolation. *Kyles*, 514 U.S. at 438.

In assessing materiality, the trier of fact "must imagine that every piece of suppressed evidence had been disclosed, and then ask whether,

44

assuming those disclosures, there is a reasonable probability that the jury would have reached a different result." *Browning*, 875 F.3d at 464.

The district court reasoned the "hair evidence was not material or exculpatory," 1-ER-25, and the "bloody shoeprint evidence is not material," 1-ER-29. There are at least three problems with this notion.

First, the decision contradicted precedent in *Browning* that held that Branon's disclosures were "powerful evidence that Browning was not the killer." *Browning*, 875 F.3d at 463-64. The district court should have recognized "Hugo's vivid description of a hairstyle so different from Browning's presented substantial reason to doubt that Browning was the one who stabbed Hugo." *Id.* As a result, if "the jury no longer had reason to reject that description, and the jury knew that the description came from the victim, it would have raised grave doubt about the prosecution's theory of the case." *Id.* Evidence that raises a "grave doubt" as to the prosecution's case is necessarily material.

Second, the trial court's contrary analysis implies that materiality is only met if a jury would not have been *required* to acquit Browning at trial based upon speculation about the jury's own deliberations. 1-ER-25-29. That is too high a legal standard for assessing materiality in the

45

*Brady* context. Instead, under *Brady*, a plaintiff need not prove beyond metaphysical doubt he would necessarily be acquitted to state a *Brady* claim, she must only present evidence of a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

Third, to find the evidence did not matter requires construing the record *against* Browning and taking inferences in Defendants' favor. The question is not—as it might be in a criminal context—to construe the evidence in the light most favorable to the conviction and ask whether the result *must* be different; the evidence must be construed in the light most favorable to Browning to determine whether a reasonable jury could find the evidence material at the upcoming trial. The answer is "yes."

With the now-disclosed evidence, Browning would have been able to point out that the first-arriving officer obtained a description *from the perpetrator* that could not have been Browning and then was "surprised" when Browning was arrested. *Cf. Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) ("Independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses."). Browning would have been able to point out that

the bloody shoeprints were there before paramedics arrived, allowing him to attribute them to the perpetrator and use Branon, Radcliffe, Robertson, and Horn as defense witnesses. That would have altered the entire proceeding. Browning would have been able to point out that, with evidence that Browning could not have been the perpetrator, the detectives nonetheless targeted him anyway, casting doubt on their entire prosecution, raising new questions as to why the Wolfes were not ever charged with the crimes, and undermining the ability of the officers to attempt to explain away discrepancies (or lies) in their reports. Browning would have been able to point out that Branon, Horn, and others destroyed their contemporaneous notes from the day of the crime, casting a further shadow on their work.

This is more than sufficient. *See, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 394, 136 (2016) (evidence impeaching one witness sufficient to be material); *Mellen*, 900 F.3d at 1098 (evidence material where it would have "provided the defense with a new and different ground of impeachment").

### 4. Defendants acted with deliberate indifference to or reckless disregard for Browning's rights

To meet this standard, "Plaintiffs are not required to establish that the [police officers] acted in bad faith in withholding the evidence." *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1090 (9th Cir. 2009). Unsurprisingly, particularly given the fact disputes, mental state is a not a suitable question for summary judgment. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984); *cf. Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

A reasonable jury can easily find each of the Defendants had the relevant mental state, particularly given the departures from standard policing practices. *Mellen*, 900 F.3d at 1096. In addition, Defendants collectively discussed the bloody shoeprints issues the day it happened, including not only Branon and Horn, whose liability is obvious, but with Radcliffe, Leonard, and Bunker as well—each of whom were on scene very early in the case and part of the shoeprint discussion. In addition, as it relates to Hugo being the one who made the description, Branon cannot escape liability on this claim, for which he is the one with personal knowledge. A reasonable jury could easily conclude that Leonard, a lead detective, knew about the exculpatory hair and bloody shoeprint and

48

suppressed it, amounting to indifference. Plaintiff's contention is that Radcliffe wrote misleading reports in a way to obscure and mislead, a fact he did not (and still has not) disclosed.

Despite all of this, the district court reasoned Branon could not have "deliberately suppressed the hairstyle evidence" because *some* information made it into his report. That is contrary to the law. The "government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative"; the "'government is obligated to disclose *all* material information casting a shadow on a government witness's credibility.'" *Mellen*, 900 F.3d at 1097-98. Branon was required to disclose *all* exculpatory information, not just his interpretive gloss on a portion of it. *Id.*

In fact, the incomplete report is part of the reason why a reasonable jury could find the *Brady* violation was reckless or deliberately indifferent. That report failed to mention the actual description and its (crucial) source, a glaring omission that misleads more than it discloses (and that separately shows Plaintiff has a claim for fabrication). *Cf. Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997); *United*

49

*States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021).

### 5. Browning was not required to seek what Defendants were hiding

The district court held there was no due process violation by reasoning Browning's counsel should have tried harder to learn of the suppressed evidence including by asking the officers, on the fly, about the suppressed material at trial. 1-ER-25-29.

This analysis turns *Brady* upside down and inserts a requirement for the defense to find what the police are hiding. That is not the law. Echoing this Court in *Mellen* and *Carriger*, the Sixth Circuit has explained police cannot "turn over some evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs" *Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450, 468 (6th Cir. 2016); *see Jefferson v. United States*, 730 F.3d 537, 541 (6th Cir. 2013) (a defendant is not required to "repeatedly to scavenge for facts that the prosecution is unconstitutionally hiding from him"). Instead, the officers had an *affirmative obligation* to disclose the evidence. *Bagley*, 473 U.S. at 676, 682; *Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir. 2001).

50

As a result, the defense "may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce" and the State's disclosure "obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014); *see Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that police may not play hide and seek with the evidence, as such a rule is "not tenable in a system constitutionally bound to accord defendants due process").

Finally, and related, the government's affirmative obligation to produce material confirms why material omissions in the officers' reports matter—the reports suggest that is all the information that exists. *see Floyd v. Vannoy,* 894 F.3d 143, 162-63 (5th Cir. 2018).

## IV. Plaintiff's Unreliable Identification Claim Must Be Tried

### A. This Claim Was Forfeited and Summary Judgment Is Foreclosed by *Browning*

Defendants did not address this issue whatsoever in their motion. The issue was forfeited. So, this claim should proceed to trial. This Court already found sufficient factual issues to alone deny summary judgment on this claim. *Browning*, 875 F.3d at 451-52, 464, 467-68. Even without

preclusion, none of the material facts have changed—Browning's constitutional rights were violated. *Id.* at 464.

### B. Defendants Violated Browning's Rights by Generating Unreliable Misidentifications Presented at Trial

Forfeiture aside, the misidentifications "presented at trial were significantly flawed, and the "officers' presentation procedures were textbook examples of suggestive techniques." *Id.* at 467. A "major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). The "annals of criminal law are rife with instances of mistaken identification," and the "identification of strangers is proverbially untrustworthy." *Id.* The admission of unreliable identification evidence at trial violates the right to due process and the constitution's guarantee of a right to a fair trial. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Manson v. Braithwaite*, 432 U.S. 98 (1977).

As such, the violation of this core right is actionable under § 1983. *See, e.g., Caldwell*, 889 F.3d at 1114; *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006); *Alexander v. City of South Bend*, 433 F.3d

550, 555 (7th Cir. 2006); *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000); *Wray v. Johnson*, 202 F.3d 515, 524 (2nd Cir.2000).

The inquiry in a § 1983 case is the same as it would be in a criminal context given the right at issue is derived from the same standards. *See Memphis Community Sch. v. Stachura*, 477 U.S. 299, 306 (1986); *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (same).

Given there is no dispute the identification evidence was used at trial, the operative questions are (1) whether there were suggestive procedures, and (2) whether the identification was unreliable. *Neil*, 409 U.S. at 199; *Manson*, 432 U.S. at 113; *Alexander*, 433 F.3d at 555-56; *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007). A reasonable jury can easily find both elements satisfied.

First, suggestiveness occurs, among other ways, when a person is in "some way emphasized" or the police indicate that "one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383 (1968); *see also United States v. Field*, 625 F.2d 862, 865-67 (9th Cir. 1980). When considering suggestiveness, the Court asks "whether the witness's attention was directed to a suspect because of police conduct." *Simmons*, 390 U.S. at 383. This alco includes the characteristics of the

53

suspect, and the manner of presentation. *See, e.g.*, *Grant v. City of Long Beach*, 315 F.3d 1081, 1086-87 (9th Cir. 2002) (racial characteristics considered when assessing suggestiveness).

The show-up procedures were beyond suggestive and included egregious facts for even a show-up, including Browning being unclothed, in a police car, the witnesses being told they had the suspect, and the witnesses being asked to view Browning at the same time, tainting all of their "identifications."

As this Court previously described it, Elsen's "identification" was not made initially and came "only after seeing Browning at more than a dozen preliminary hearings, and at each he was presented as the accused." *Browning*, 875 F.3d at 467. Coe's misidentification "not much better, as the police presented "Browning—who was shirtless and handcuffed—and said, '[w]e think we have a suspect. Is this him?" *Id.* Browning's appearance and Defendants' suggestion question "rendered the procedures highly suggestive." *Id.* Browning was shown to Woods in only pants. *Id.* Though unequivocal, Woods's identification was "in response to a suggestive, one-person showup," *id.*, and was of the wrong person. The process was suggestive.

54

Second, a reasonable jury can easily find the identification evidence was unreliable, as inherent in this Court's prior decision. That aside, in making this inquiry, courts consider the totality of the circumstances and ask whether there is a substantial likelihood of misidentification. *Neil*, 409 U.S. at 198-201. Social science can inform this inquiry. *United States v. Beck*, 418 F.3d 1008, 1012 n.2 (9th Cir. 2005).

Here, at summary judgment, there is not a *likelihood* of misidentification, it is a fact that must be presumed true. In a case where the record reflects an actual misidentification of an innocent person, it is established that the identification was not reliable. Beyond that, construing other factors identified in *Neil*—like the opportunity to view the suspect, degree of attention, accuracy of description, level of certainty, and length of time between the event and confrontation—there is ample evidence for a reasonable jury to find unreliability. Two of the witnesses (Josy Elsen and Coe) had very limited opportunity to view the perpetrator; they were likely distracted by the events unfolding (particularly with Josy); and, most important, they were initially equivocal. This bespeaks unreliability, as a matter of common sense and social science. 5-ER-766-67, 769-73, 778-79, 784-90. And, while there was

55

not much time between the event and the confrontation, the manner in which it occurred—highly suggestive circumstances as opposed to at the police station—actually bespeaks unreliability as well. *Id.*

At summary judgment, the facts must be construed in Browning's favor. And, the factors in the totality of the circumstances must be construed in Plaintiff's favor as well. A jury can evaluate the totality and find that the misidentification of an innocent person following egregious, sloppy, and gratuitous suggestion was (quite obviously) unreliable.

Though Plaintiff was given no opportunity to address this below, Defendants ghostwrote in the order adopted by the trial court that the law was not clearly established in 1985. The contention fails. In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons*, 390 U.S. at 383, and it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson*, 432 U.S. at 98. With other authorities, the cases cited above—*e.g.*, *Wade*, *Simmons*, *Neil*, and *Manson*—clearly established the right to be free of unreliable identification evidence at trial and that these rights may be violated

56

where, as here, police use suggestive tactics that ultimately taint a criminal trial. *See also Stovall v. Denno*, 388 U.S. 293 (1967).

In short, the question of immunity was forfeited and is otherwise unavailable.

## V.    Plaintiff's Fabrication Claim Must Be Tried

The district court erred in granting summary judgment to Defendants on evidence fabrication when Defendants forfeited the issue by failing to argue it in their motion. *See* 5-ER-857. Reversal can be predicated on that basis alone.

Forfeiture aside, the record would allow a reasonable jury to conclude that Defendants fabricated evidence by putting fabricated, misleading, and/or unreliable information in their own reports. "[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence" is "virtually self-evident." *Devereaux v. Abbey,* 263 F.3d 1070, 1075 (9th Cir. 2001).[4]

Fabrication can be proven directly and circumstantially. *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). Direct fabrication can occur

---

[4] There is no dispute that the prohibition on fabricating evidence was clearly established in 1985. Thus, Plaintiff does not address it.

where reports or documents include things that are simply false; where reports or documents "contain[] evidence" that does not exist or purport to record statements that were "never made." *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010). Direct fabrication also occurs where officials "deliberately mischaracterize[]" evidence. *Spencer*, 857 F.3d at 798; *see also Costanich*, 627 F.3d at 1112. And, as explained above, direct fabrication can come where misrepresentations are supported by material omissions that mislead and taint the process.

Under the direct method, the investigator's knowledge or reason to know of the plaintiff's innocence is irrelevant, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 800. Put differently, "motive evidence is never *required*." *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022).

Fabrication can also be proven circumstantially, including by evidence showing the defendants continued the investigation even though they knew or should have known Plaintiff was innocent. *Caldwell*, 889 F.3d at 1112; *Spencer*, 857 F.3d at 799. As to this route, if "an investigator knows that a person is innocent, yet continues the

58

investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence." *Id.*

Plaintiff has presented ample evidence of fabrication pertaining to: (1) the arrest warrant affidavit, written by Radcliffe, which includes false statements that were never made and falsely describes the Wolfes' room and what Browning was wearing when he was arrested; (2) documents purporting to say that the Wolfes were reliable informants; (3) documents claiming Betty Browning made inculpatory statements about her son; (4) Branon's report (omitting the description of the perpetrator made by Elsen, calling the description a "Jheri curl" while also attributing it to three witnesses (the Elsens and Coe)); (5) reports by Bunker and Radcliffe claiming that Browning was unclothed when they arrested Browning; and (6) reports/documentation from officers, including Horn, concerning the bloody shoeprints.

Because Defendants failed to address these issues in their motion and therefore forfeited the argument, 5-ER-823-76, the district court erred in dismissing the fabrication claim. And because the district court's

59

decision was a cut-and-paste of Defendants' motion, the court did not discuss the bulk of Plaintiff's fabrication theories. 1-ER-29.

The only issue addressed below was Radcliffe's report falsely bolstering the Wolfes' credibility (1-ER-29-30). But, the discussion construed the evidence in Defendants' favor and ignored the inferences a jury could make about the Wolfes, particularly given their criminal backgrounds, connection with the actual perpetrator ("Willy"), possession of the criminal proceeds, and their farfetched account about Browning. In this telling, LVMPD officers had no reason to doubt the word of known serial criminals, who happened to walk by the jewelry store just minutes after the crime and offer up the alleged perpetrator, stolen goods, and murder weapon right then and there. Defendants claim that they believed the incredible story that the people producing proceeds from a crime and the murder weapon were simply given these items by an acquaintance who spontaneously confessed to them. This defies credulity.

A reasonable jury could also find Radcliffe put information in his reports that was blatantly inaccurate or that involved words that were not said. *Cf. Spencer*, 857 F.3d at 799-800.

60

## VI. Plaintiff's *Monell* Claim Must Be Tried

Municipalities cannot be liable under a *respondeat superior* theory, but they may be liable where employees are "acting pursuant to an expressly adopted official policy," or pursuant to a "longstanding practice or custom." *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). Plaintiff's discussion at summary judgment below addresses the legal standards and evidence in support of her claim, which is incorporated to the extent necessary for context. 2-ER-189-95.

The district court's decision, however, rested on the fundamentally mistaken premise that individual liability is a prerequisite to municipal liability. While it is true that a jury must find Plaintiff's constitutional rights were violated in order for LVMPD to be liable, it need not find a particular officer responsible in order to hold LVMPD liable. *See, e.g.*, *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Richards*, 39 F.4th at 574; *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 n.12 (9th Cir. 2016). The district court was simply wrong in holding that if one of the defendant officers was not liable, then the claim fails as a matter of law under *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam). 1-

61

ER-36. There is a difference between *liability*, on one hand, and a constitutional violation, on the other.

Indeed, this Court has explained that *Brady* claims concerning the suppression of evidence is precisely the type of *Monell* theory that is "not premised on a theory of liability that first requires a finding of liability on the part of the individual officers." *Richards*, 39 F.4th 574; *cf. Vargas v. City of Los Angeles,* 2021 WL 2012592 (9th Cir. May 20, 2021). In situations like those here, a municipality may be liable "'whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof.'" *Richards*, 39 F.4th at 574 (quoting *Fairley*, 281 F.3d at 917 n.4). Reversal is warranted.

## VII. Plaintiff's Fourth Amendment Claim Must Be Tried

The district court also dismissed Plaintiff's Fourth Amendment "malicious prosecution" claim. 1-ER-32-34. This was error. In order to proceed on this claim, Plaintiff must demonstrate: (1) Browning was detained in the absence of probable cause, (2) Defendants proximately caused the detention, and (3) favorable termination of the criminal proceedings. *Thompson v. Clark*, 142 S. Ct. 1332 (2022).

There is no reasonable dispute about the second and third elements. The Defendants in this action were the police officers who investigated the Elsen homicide, arrested Browning, and wrote (fabricated and/misleading) reports about the investigation, etc. That is sufficient. *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007). Nor could the causal chain hypothetically be broken by decisions of a prosecutor, given the fabricated evidence and suppression of exculpatory information. *Caldwell*, 889 F.3d at 1116.

The criminal proceedings terminated in Browning's favor, the charges were dismissed, and he was released.

As to probable cause, a reasonable jury could easily find it did not exist because it was tainted by the fabrication of evidence and the suppression of exculpatory evidence and based on unreliable, fantastical statements by the Wolfes and unreliable, suggestively-obtained misidentifications. *See Manuel v. City of Joliet*, 580 U.S. 357, 369 n.8 (2017); *Scafidi v. LVMPD*, 966 F.3d 960, 963-64 (9th Cir. 2020); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001); *Cameron v. Brown*, 721 F. App'x 612, 613-14 (9th Cir. 2017).

63

To reach the conclusion that no reasonable jury could find for Plaintiff, the facts must be construed against Plaintiff, which is impermissible. *Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017). A reasonable jury could easily find that suppressing evidence of Browning's innocence while building a fake case based on lies of known criminals and via egregiously suggestive behaviors was unlawful.

In the end, "the existence of probable cause is a question for the jury." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984). Summary judgment cannot be entered on this claim. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). Reversal is required.

## VIII. Plaintiff's Failure To Intervene Claim Must Be Tried

"'[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen'" and "they ha[ve] an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000); *see also Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1029-30 (9th Cir. 2002); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995); *Tobias v. Arteaga*, 996 F.3d 571, 583-84

64

(9th Cir. 2021).[5] Where "an officer fails to intercede, 'the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who' performed the offending action." *Tobias*, 996 F.3d at 583-84.

Here, the record shows that each Defendant had the opportunity to intercede but failed to do so in a number of ways, particularly since they specifically discussed things like the exculpatory bloody shoeprints, their reports overlap; and they all participated in the prosecution. Each had an opportunity to stop an innocent person from going to death row; they elected misconduct and suppression of exculpatory evidence instead.

## IX.    Plaintiff's Conspiracy Claim Must Be Tried

A § 1983 conspiracy involves "an agreement or 'meeting of the minds' to violate [the plaintiff's] constitutional rights." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983). Such an agreement "may be inferred

---

[5] Defendants have argued that failure to intervene claims are confined to the excessive force context. That contradicts the law of this Circuit, and others that have likewise have not confined this duty to the force context. *See, e.g., O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972); *Whirl v. Kern*, 407 F.2d 781, 788-91 (5th Cir. 1968);  *Nesmith v. Alford,* 318 F.2d 110, 119 (5th Cir. 1963); *Smith v. Ross*, 482 F.2d 33, 36 (6th Cir. 1973); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982).

from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some "facts probative of a conspiracy." *Id.* An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants" meaning, for example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999). Existence of a "conspiracy is generally a factual issue and should be resolved by the jury." *Id.*

Here, there is substantial evidence of an agreement. Defendants' only argument otherwise—that they were merely negligent—is a contention that can be made to the jury but is not acceptable at summary judgment because it construes the evidence against Plaintiff. A jury can find that officers who jointly suppressed exculpatory information, fabricated overlapping reports, generated unreliable identification evidence via egregiously suggestive procedures, and then collectively hid information for decades were acting pursuant to an agreement. A jury must resolve this question.

66

Adopting Defendants' proposed order, trial court found questions about the intracorporate conspiracy doctrine somehow preclude relief. Plaintiff acknowledges there has been some recent confusion about this doctrine. *E.g.*, *Lobato v. LVMPD*, 2023 WL 6620306, at *2 (9th Cir. Oct. 11, 2023). But, turning back to first principles, this Court should clarify that the doctrine does not apply to § 1983 cases against public officials.

For one, this Court has issued many decisions finding conspiracies between officers of the same department for decades. *See, e.g., Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013); *Baldwin v. Placer Cnty.*, 418 F.3d 966, 970-71 (9th Cir. 2005); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999); *Dirks v. Martinez*, 414 F. App'x 961, 963 (9th Cir. 2011).

This Court has described the elements of a claim, and never added a requirement that the "officers be from different entities." *See Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010); *Woodrum v. Woodward County, Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989); *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). None of this law is compatible with the notion that the intracorporate

67

conspiracy doctrine applies to § 1983 cases.

Second, to the extent this is a question about qualified immunity, it is obvious that if an officer cannot, for example, suppress exculpatory evidence, that they cannot reach an agreement to work with another officer to do the same. Like the prohibition on fabrication of evidence, it is "virtually self-evident."

Third, the decision that has caused the confusion, *Ziglar v. Abbasi*, was talking about a different sort of claim. 582 U.S. 120, 153 (2017). In *Ziglar*, addressing 42 U.S.C. § 1985(3), the Supreme Court wrote "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." 582 U.S. at 153. The analogy was derived from the antitrust context, and the statute is about private conspiracies, does not require state action, and does not require the violation of an independent constitutional right. 42 U.S.C. § 1985(3). That in mind, *Ziglar* explained:

> Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal.

582 U.S. at 153.

68

None of this applies to Section 1983 claims, where the Supreme Court has rejected the rules that animate the intracorporate conspiracy doctrine. For one, there is no imputed liability—individuals can only be liable for their personal actions. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Supreme Court has also rejected, quite forcefully, the notion that actions of employees may be "attributed to their principal." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). As a result, because there is no imputed liability under § 1983, there can be no "intracorporate" conspiracy.

Finally, given the law in 1985, which *Ziglar* did not disrupt, Defendants had fair notice that conspiring to violate Browning's constitutional rights was unlawful. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (qualified immunity looks at the status of the law "at the time of the challenged conduct"); *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1018-19 (9th Cir. 2020) (same). A decision decades after the fact—construing a different statute based on a premise inapplicable to this context—cannot serve as the basis for immunity here.

69

## X.     Plaintiff's State-Law Claims Must Be Tried

The Nevada Supreme Court recently held that a damages remedy exists under the Nevada Constitution for substantive constitutional violations, and that the Nevada Constitution is incompatible with qualified immunity. *Mack v. Williams*, 522 P.3d 434 (Nev. 2022).

*Mack* suggests that the Nevada Constitution may be more protective of rights than federal law. For present purposes, reversal of summary judgment on the federal claims is sufficient to also reverse on the state-law constitutional claims for suppression of exculpatory material, the fabrication of evidence, and the state analogue to the Fourth Amendment. The trial court's discussion of the forfeited arguments about the unreliable identification also require reversal because the Court is wrong about the constitutional violation and because immunity does not apply under the Nevada Constitution.

A trial is also warranted on Plaintiff state-law claims for (1) civil conspiracy, (2) abuse of process, (3) intentional infliction of emotional distress, and (4) malicious prosecution.

70

First, the same facts about a civil conspiracy discussed above pertaining to § 1983 conspiracy apply to Nevada's doctrine and are incorporated here.

Second, an abuse of process claim involves a showing that the defendant (1) had an ulterior purpose abusing the process other than resolving the dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. *Land Baron Inv. v. Bonnie Springs Family LP*, 356 P.3d 511, 519 (Nev. 2015) (citing *LaMantia v. Redisi*, 38 P.3d 877, 880 (Nev. 2002), and *Posadas v. City of Reno*, 851 P.2d 438, 444-45 (Nev. 1993)).

Here, the judicial process was abused by Defendants in their decisions, with the Wolfes, to frame Browning for a murder he did not commit, intentionally suppress exculpatory evidence and fabricate evidence. This is an improper motive and purpose. *See, e.g., Lobato v. LVMPD*, 2022 WL 4017055, at *14 (D. Nev. Sept. 1, 2022).

Third, prosecuting an innocent person for a crime they did not commit is outrageous behavior that causes severe or extreme emotional distress and thus states an intentional infliction of emotional distress claim. *Rivera v. Corr. Corp of Am.*, 999 F.3d 647, 655 (9th Cir. 2021).

71

Courts routinely deny motions for summary judgment in wrongful prosecution cases, like this one, where a reasonable jury can conclude that the officers caused the wrongful imprisonment of an innocent person. *E.g.*, *Woods v. City of Reno*, 2020 WL 4194844, at *1-2, 16 (D. Nev. July 21, 2020); *Lobato*, 2022 WL 4017055, at *15 (D. Nev. Sept. 1, 2022); *Fatai v. Ramos*, 2023 WL 2392707, at *18 (D. Haw. Mar. 7, 2023).

Fourth, Nevada's malicious prosecution claim, derived from the common law, *see LaMantia*, 38 P.3d at 879-80, must proceed. The main difference between this and Plaintiff's Fourth Amendment claim concerns malice. "Malice" is not a component of § 1983 liability, *see Graham v. Connor,* 490 U.S. 386, 399 (1989), but it is an element in Nevada law, *Bonamy v. Zenoff*, 362 P.2d 445, 446 (Nev. 1961). This is ultimately immaterial because "malice may be inferred from proof of want of probable cause," *id.,* and probable cause cannot be based upon fraud or "other corrupt means." *Chapman v. City of Reno*, 455 P.2d 618, 620 (Nev. 1969). Probable cause can also be rebutted where, as here, there is evidence of suppressed material facts that would have undermined the probable cause determination. *See Ricord v. C.P.R.R.*

72

*Co.*, 15 Nev. 167, 180 (1880); *Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 49 (Nev. 2005). That happened here.

## XI.  A Different Judge Should Be Assigned On Remand

Reassignment to a different judge under 28 U.S.C. § 2106 is sometimes appropriate. *See Smith v. Mulvaney*, 827 F.2d 558, 563 (9th Cir. 1987) (listing factors). Reassignment is warranted here. The district court decreed it had made up its mind upon reading Defendants' motion. It provided no reasoning, no preliminary findings, or anything else. Then, the court simply signed the summary judgment opinion drafted by Defendants without any substantive changes.

It is impossible for the district court to have expressed anything other than an adherence to the Defendant's views in this case *in toto.* The appearance of justice cannot be maintained with a court presiding over a trial where it has already declared one side to be the winner regardless of the opponent's evidence. Nor would reassignment entail waste and duplication out of proportion to any gain in preserving the appearance of fairness; no pretrial preparations have been conducted.

73

## CONCLUSION

The district court's judgment against Plaintiff should be reversed and the case remanded for trial.

Respectfully submitted,

s/ Elizabeth Wang
*Counsel for Plaintiff-Appellant*

David B. Owens
CIVIL RIGHTS AND JUSTICE CLINIC
UNIVERSITY OF WASHINGTON LAW SCHOOL
William H. Gates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
O: 312-243-5900
david@loevy.com
*Counsel for Plaintiff-Appellant*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720-328-5642
elizabethw@loevy.com

74

## CERTIFICATE OF COMPLIANCE

I, counsel for Plaintiff-Appellant, hereby certify that this brief contains 13,997 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complied with the word limit of Cir. R. 32-1.

s/ Elizabeth Wang
*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

The undersigned attorney states the following: I am unaware of any related cases currently pending in this court.

s/ Elizabeth Wang
*Counsel for Plaintiff-Appellant*